May it please the court. Beth Klusman for the appellants. TDCJ employees who have medical issues that prevent them from working are given 180 days of leave without pay or LWOP in a rolling calendar year. Ms. Harmon exhausted that leave and federal law does not require TDCJ to accommodate her with additional leave because an individual who can only work half of the year is not qualified for the position of correctional officer. On top of that, Ms. Harmon's primary evidence of discrimination and retaliation is that a human resources employee may or may not have made an error in calculating her LWOP, but mistakes are not proof of discriminatory or retaliatory intent. And even if you don't believe anything that I say today, or if I fail to persuade you on the merits, the damages award should be reversed because Ms. Harmon would not have earned $1 million in the four years between her separation and trial in this case. So for those reasons and others that I'll be happy to discuss today, we ask that the court would reverse the judgment of the district court. I'll begin where our brief does with whether or not Ms. Harmon is a qualified individual with a disability, and that's going to go to both her failure to reasonably accommodate claim as well as her discriminatory separation claim. And the question boils down to whether or not the amount of leave she needed to accommodate her disabilities was reasonable, whether federal law considers that a reasonable accommodation. And the circuits are fairly uniform in agreeing that some amount of leave certainly is a reasonable accommodation, but at some point leave is transformed from merely enabling the employee to perform their essential functions, which is the purpose of the ADA and the Rehabilitation Act, to excusing the employee from performing the essential functions. The first is required, the second is not. And so where do we draw that line? The Tenth Circuit, in an opinion by then-Judge Gorsuch in Huang v. Kansas State University, identified three potential factors a court could consider, and that would be the duties in question, the job duties, the nature and length of the employees. On all three of those factors here, point towards the leave Ms. Harmon needed, which was over 180 days, as unreasonable and not required by federal law. How is this case different from the Southwest Airlines case? Sure. Two points on that, Your Honor. The first is the flight attendant schedule that was at issue in Carmona was extremely flexible. It sounds like they could pick and choose which flights they worked on. Whereas here, your schedule was six days on, three days off. And then the attendance policy in Carmona, they did say it was extremely lenient. And when Southwest argued that, well, you exceeded even— But there was evidence here that there was also flexibility with the—there are other employees who were willing to swap and make switches. Why isn't this similarly flexible? Well, the—when I refer to flexibility, it's when you're set to work. And so that would be the six and three. Whether or not employees are willing to fill in for each other, that really goes more to the undue hardship affirmative defense, whether or not TDCJ can manage her loss, you know, the— Why wouldn't it show that—admittedly, every company does it differently, but— Sure. It's the rare company where there's true inflexibility. There's generally some flexibility for employee morale, if nothing else. And TDCJ did provide her with those 180 days of leave, so I— Right. Right. So— That kind of shows that it is not that—the fact that TDCJ is willing to do this shows that it's not that inflexible. I will say the 180-day deadline is inflexible. There was no evidence that anyone had ever exceeded 180 days of leave under the policy. And so employers are allowed to draw that line. What I was going to get to in Carmona is there was evidence that people had exceeded the point system there. You earned a certain number of points, and once you exceeded that, you were terminated. And so that's not the case here. In Carmona, that suggested that perhaps exceeding the amount of leave was not really a qualification, that it was more—since the Southwest Airlines had been willing to overlook that in certain circumstances. That's not the case here. And this Court has actually recognized that distinction before in Weber v. BNSF Railway. That wasn't in our brief, but it's 989 F. 3rd 320. And there, the Court said that that extremely lenient schedule did not apply to trained dispatchers who had set schedules and were terminated for excessive absenteeism. He had five excused—or unexcused absences in three months. And so we do consider employers' policies, and here they did have a 180-day policy, but they also drew a hard line at 180 days. And if we look at other precedent from other circuits, for example, the Huang case that I mentioned— The idea that you're qualified if 180 days is enough, but you suddenly become unqualified if it's not enough? I wouldn't—I wouldn't say it's exactly 180 days. It's just the question is have you—are you able to perform the essential functions? And so is more than 180 days a six months. So that's—it's similar. Hers came all at once. But the Court there said that inflexible policy was permissible, and actually it can benefit the disabled employees because everybody's operating under the same system. You're not masking discrimination with discretion then. As long as you give a sufficient amount of leave, then you can draw that line and everyone's treated the same. If you think about it, TDCJ has 30,000 employees. And so having a very set system that everybody abides by, you don't have one warden given two months over here, another warden given four months over here. You just make sure everybody gets more leave than would be necessary to meet a reasonable accommodation. You say that 180 days isn't flexible, and that's the relevant point here. Wasn't there evidence for the jury that the calculation computation that 180 days was in dispute, that a different calculation had been made, that at least there was evidence introduced that it had been improperly calculated at some time, and she had been told that she did have some leave left? There was dispute at trial whether or not she was given the full 180 days. But I think at most we're talking about a couple days difference on the end. Now, I do think if you look at the evidence as a whole, she was given that 180 days, but I can see how the jury might have thought that she may have been shorted a day or two. They're the ones who get to look at the evidence as a whole, and we need to decide on a very differential review standard whether they made a legitimate decision. Sure. And I guess the first point would be as long as she received what was a reasonable accommodation, then if she got 178 versus 180, then that's not going to alter the failure to reasonably accommodate claim. And the second point would be that a mistake in calculation doesn't demonstrate any sort of discriminatory intent for purposes of her discriminatory separation claim. Mistakes happen, and so they are not proof of unlawful intent. But if you are concerned about the whole 180-day limit, I would point you to, for example, Exhibit 5 in the record at ROA 36. That's a computer printout of her remaining LWOP days. This was Harmon's exhibit, and she didn't call it into question. But if you look up in the right-hand corner, it tells you how many LWOP days she had left and how many that she had used. And you can see, if you put the pages in chronological order, that that was steadily decreasing. I think in April, she was down almost to the single digits. And so when we're talking about whether or not she received the full 180 days, I think she did. But if she didn't, we're talking only a day or two difference. And so that's not sufficient to demonstrate that TDCJ failed to reasonably accommodate her. But since we are talking a little bit about causation, I'll go ahead and discuss the retaliation piece of that. Ms. Harmon has argued that she engaged in two different protected activities and was retaliated against for them. And the first is her September 2017 complaint regarding her shift change. She said that that was discriminatory. Now, but Reyes, Ms. Reyes is the human resources employee who calculated her LWOP and then began the separation when she believed she had hit 180 days. She had no knowledge of that complaint. There was no testimony that she was aware that that complaint had been made. So she could not have retaliated against Ms. Harmon for making that complaint. The other protected activity that Ms. Harmon identifies is her May 31st to doctor's note that said she could return to work on June 4th. And she asserts that that was a request for a reasonable accommodation. Now, even if we assume that was, Reyes had called Ms. Harmon on May 30th and said, you will be separated on the 31st if you do not come back to work. And the Supreme Court in Clark County versus Breeden, that's cited in our brief, although for a different point, it says that proceeding along the lines that you had previously announced is no evidence of retaliation if someone engages in a protected activity in the meantime. So Ms. Harmon was aware Ms. Reyes had told her on the 30th that you will be separated if you don't come back to work on the 31st. And then this doctor's note comes in and proceeding to separate her even though the doctor's note had come in is no evidence of retaliation. I mean, Ms. J gave her all of the leaves she requested in those doctor's notes until she hit that 180 day limit. That's the only thing that changed. And that is not sufficient evidence of retaliation. Let's see. I'll just go on then and discuss the rehire argument. That comes down to who the decision maker is and whether there is, again, evidence that they were motivated by a discriminatory or retaliatory intent. If the final decision maker is Billy Individual, who signed the bottom line on the decision not to rehire her, there's no evidence about him in the record, so there's nothing on which the court could face a discriminatory or retaliatory intent conclusion. If, however, John Warner, who recommended not rehiring her, is considered either the decision maker as having some sort of influence over the final decision, there's insufficient evidence regarding his intent as well. The only interaction between him and Ms. Harmon occurred in the fall of 2017 when he instructed the warden to move her back to first shift. When she had complained about being moved from first to second shift, he's the one who said, move her back. And that's it. That's the extent of their interaction until he recommended not rehiring her. And so, for purposes of her discriminatory non-rehire claim, her evidence is that she was disabled, she was qualified, and she wasn't rehired. And that's not enough to even make out a prime facie case of failure to rehire based on disability, much less to support a jury finding on that point. With respect to any potential retaliatory motive, again, her complaint from September of 2017 was over two years earlier, and so the Supreme Court has held that that type of timeline is too long to infer retaliation if that's all you've got. And there's no evidence that he was aware of her EEOC charge that she filed after she was terminated. So again, he could not have been retaliating against her for that. In the time you have left, why don't you address the million-dollar question? Absolutely, Your Honor. So if you believe, first of all, that there is sufficient evidence to support the verdict and that you don't have to worry about the irreconcilable verdict, then you would get to the damages question. And the jury awarded $1 million in back pay. The specific question was wages and benefits from May 31, 2018, to April 7, 2022. And Harman's own testimony was that she had lost $227,000 during that time period. So just based on her testimony alone, there's no reason to give her $1 million in back pay for that verdict. Tell me something about the motions that were filed post-verdict, argument that perhaps this should be considered front pay. Did the district court rule on the motion of whether this should be considered front pay or not? Ms. Harman did request front pay. That wasn't submitted to the jury, though, was it? It was not, Your Honor. The district court concluded that she had failed to plead a request for front pay under the Rehabilitation Act. And because she did not plead a request for front pay, she was denied any front pay as a result. So you're saying, as we evaluate that award, what are we limited to considering it as being? It is back pay. It is the wages and benefits she would have earned between 2018 and 2022. That's the specific jury question that was asked and answered. And again, she was denied front pay. So the argument that these ERS benefits that she would have received had she remained employed until 2029 and then retired, that's where we get sort of the $800,000. But that's still five years in the future from today. So that would not have been wages and benefits she would have received between 2018 and 2022. And so that's sort of the issue on damages. I would also then, just as we're on that point, Brian Collier, sovereign immunity prevents damages against him. If you keep the damages awarded, it doesn't make that much difference. But sovereign immunity does bar damages against him, and so she should be removed from the judgment, regardless of what this court does with respect to damages. On the irreconcilable verdict theory, just to make sure I understand, surely we've had cases where we have affirmed verdicts under both theories of liability, retaliation, discrimination. I'm not saying those same standards of causation, no. Well, if they were both but for causes, if, for example, it was the ADA and retaliation, those are both but for causes, so you can have more than one but for cause. But the Rehabilitation Act, which is what she was proceeding against under the, against the TPCJ, that requires a sole cause, so it is different from the ADA in that extent. So when it's the, like, I believe we cited a Third Circuit case in our reply brief, but if you have a sole cause under the Rehabilitation Act, that prohibits any other but for cause of the action. You're saying it would have been illogical for an appellate court to affirm both, a verdicts of both claims? Under the Rehabilitation Act, yes, because it requires sole causation. Again, if we're preceding on where both, most other statutes require only but for causation, and you could have more than one but for cause, so you could affirm both in that circumstance, but the Rehabilitation Act is unique. And so for those reasons, Your Honor, we ask that you would reverse the judgment of the district court. May it please the Court? Good morning. I'm going to jump right in, kind of follow the same flow with the qualified individual, right? That's their, that's their biggest argument, I think the one they focused on the most in their brief. So it sounds like, based on what they argued at the trial court level and here on appeal, is that TDCJ says you get 180 days unpaid, in a 12 month period, and you're still qualified, right? Because we're giving that to you. We know you can still do your job, you just need some time off. But now they're drawing this bright line and saying, but anything over that, all of a sudden you become unqualified. It makes no sense. It's arbitrary. But more importantly, it's moot. Because there was sufficient and substantial evidence that in fact Ms. Harmon was not given that 180 days, right? So we have the March notice that they send to her and they say, hey, you still have 80 days of LWOP left, right? That's on March 12th. And then they also said, but she didn't take any time off in April. But then all of a sudden on May 30th, she's out of time. The numbers don't add up. So either they gave her good information back then, and when they terminated her at the end of May, their calculations were wrong, or they gave her false information in March, which she was allowed to rely upon. Regardless If this was Exhibit 5, I may have the number wrong, but an exhibit that I assume is a calculation from them to show how many days she had used, what is that and what's the relevance of that to your argument? That she either had used 180 days or not, or does that not matter because they had misled her in some way? I would say, well, so one, I don't believe that she used 180 days. Well, is there such evidence in the record, as the opposing counsel said, that would support that it was within a day or two of 180 days of leave had been used? There is evidence that all of their witnesses gave different numbers. They all contradict each other. So there's evidence that she still had two or three more days left. There was evidence, testimony, that she had already expired it a day or two before, I think on May 29th. But then in fact we have the attendance records. That was one of the exhibits that was submitted at trial where each month was a page and you could see how many days she took off each month, whether that was vacation or holiday or whether it was LWOP. The issue there is also, we're missing a whole month. So what they gave us was May 2017 through May 2018, but they left out September. So we don't even have all the records we need. And the jury was able to rely upon that and believe they're hiding something or there's something wrong with this calculation. They don't have the base data to make the calculation. And their employees couldn't agree on how it should be done. So there's evidence there that she didn't get 180 days. So this whole thing about being qualified as moot, because under their own definition, if you're under 180 days, you're qualified. When you say moot, I don't quite understand. It's just not supported by the evidence? I'm saying that if their rule is you get 180 days and you're qualified, anything over that you're not, she was under. So she's qualified. There's sufficient evidence that the jury could conclude and did conclude that she did not use the full 180 days. Similarly, on their argument about the reasonable accommodation. If you don't mean moot, you probably mean it's not material. Right. That's probably a better word. You've got mootness doctrine cases this week, so. Right. As far as the reasonable accommodation, the way they framed the argument is that her request for a reasonable accommodation was indefinite leave. Well, that flies in the face of the evidence, right? She has a doctor's note that says she can come back on June 4th. There was one workday between the day the doctor's note was submitted and when she wanted to come back. So she's actually asking for one additional workday off. That's more than reasonable, especially given the fact that she still had time, LWOP time, left under the 180 days. But regardless, right, regardless of qualified and reasonable accommodation, we still had the failure to rehire. Right. So she comes back after they've terminated her. She goes back and reapplies. Here's an employee with 19 years experience as a correctional officer. In those 19 years, she had exemplary reviews, two write-ups in 19 years, both for being tardy in 2010. So she reapplies. She gets a full medical release, as they request. Does every, jumps through every hoop they ask. And still they don't rehire her. In the face of the fact that they're facing a 8,000 person shortage for correctional officers. And they still don't rehire her. And Werner, the gentleman that made the recommendation that she not be rehired, right? So if you look at that document, there's one person that says, yes, she should be rehired. And it's Werner that says she should not. And he could not give a reason for his recommendation on the stand at trial. We asked him, well, she's qualified, right? Yes, she's qualified. She could perform the job, right? Yes. She has more than sufficient experience, right? You need warm bodies to fill these positions, right? Yes. Then why didn't you recommend her? I don't know. Well, was it based on the medical issue? No, absolutely not. I didn't even know about that. But it's on the document that he reviewed and signed that she was separated for exhaustion of medical leave, LWOP. So we had all this testimony that didn't make sense, that contradicted the evidence. And the jury was free to not believe him. But more importantly, he didn't give them a nondiscriminatory reason to even consider. To date, we don't have a nondiscriminatory reason for not rehiring her. Moving on to the damages question. So TDCJ had a chart that you've seen, right? Where they had calculated out monthly how much she made in benefits and wages, right? And that chart, I think, went through August 2021. The trial was in April 2022. So the chart wasn't complete, and it didn't carry out. I think we had another eight or nine months. But the only evidence of damages that TDCJ elicited was from Ms. Harmon herself. And there was one question where TDCJ asked, what are you looking for? What do you want? Give me a number. And in response, Ms. Harmon said, I quote, I am seeking $1.8 million and my attorney's fees. That's with my retirement and everything. So TDCJ wants to tell you that, well, the way the jury came up with the number was they took that $227,000 from our chart, and they added in this pension, right? Well, that doesn't add up to a million dollars, actually, if you do the math. So that's probably not it. But it's just as likely that the jury heard Ms. Harmon ask for $1.8 million, and she said, and that includes my retirement and everything. It's just as likely that the jury took that $1.8 million number and subtracted out the retirement pension, and that's how they got to the million. We don't know. But we don't have to know, right? It's not an exact calculation. The jury is able to determine within reasonableness what they believe her damages were, and this is the number they came up with. Finally, I think the biggest issue here that bothers me is we have a unanimous verdict from a nine-person jury that sat through trial, that heard all the testimony, that looked at all the evidence, and really took their time. I think it was two or three hours we sat there and waited for them to deliberate. They're asking you to just eviscerate that jury's verdict, that it meant nothing. And then we also have the district court judge that sat there and listened to everything and considered everything and affirmed and entered a judgment based on the jury's verdict. They're asking you to wipe that out also. That's not reasonable, not given the evidence that was actually presented at trial. And so for these reasons, I believe that in equity in law, the jury's verdict must be validated and the district court's judgment must be upheld. All right, Counselor. I'll give my time back to the Court. Thank you. May it please the Court. I do wish to talk just a little bit more about the qualified individual with a disability. I think I left that topic a little too early. What I wanted to point out is the LWOP policy itself. It applies when an employee has a condition that prevents the performance of duties or essential functions. So when you're on LWOP, you're admitting that you can't perform the essential functions of your job. So we look at the correctional officer requirements, that's 4046 and 4047 of the record, to learn what they are obligated to do every day. Admission that they're not qualified at all or that they're not qualified during the time that they need off. The LWOP really isn't so much about whether or not you are qualified. It's about how much leave they're going to give you. The qualifications to be on record. I thought you were saying just moments ago that this important point you wanted to make too about by doing LWOP, you're essentially acknowledging a fact about yourself. Well, you're acknowledging that at that moment you're unable to perform the essential functions. And so the question of how much leave you're given, I think a lot of the questions to me seem to sort of blur LWOP and your qualifications together. And the qualifications are to be able to restrain offenders, prevent escapes, care in custody. What they give you as leave is sort of a separate issue. If you look at, for example, Huang, where they had a six-month policy, the question wasn't, well, you've suddenly become unqualified after six months. It's, did they give you enough leave so that you could, under federal law. If you look at, for example, Severson out of the Seventh Circuit, he got 12 weeks of FMLA leave and then he was separated. And the question wasn't, well, you got your leave and that means you were still qualified up until that moment, so now how much do you get on top of that? The answer was, you got a reasonable amount of leave and the company is allowed to draw the line then because, again, the ADA and Rehabilitation Act are about enabling you to perform your job. Little bits of leave here and there that still allow you to work despite a disability. Not long periods of leave or excessive amounts of leave that essentially eliminate job functions. Ms. Harma essentially was a part-time employee for a year and the ADA does not require that. It doesn't require you to assign job functions to other employees. That's what happened here. Other employees had to fill in for her on a regular basis. And so the circuits are uniform and this kind of leave not being required under the ADA or the Rehabilitation Act. With respect to whether or not there was a mistake made, the only evidence they really have of a mistake is that March notice that said she had 80 days of LWOP. But she did not, I mean, if she's going to claim now that she relied on it, that means she was using LWOP that she didn't need. That means she was taking LWOP because she thought she had it, not because she needed to be off of work. So it's therefore not a reasonable accommodation anymore. It's just leave that she's using because she wants to. But her testimony was not that. Her testimony was, I only went to work when my doctor said I could and I stayed home when my doctor said I couldn't work. And so regardless of whether or not she got some bad information in March, that didn't alter the amount of leave she took. And again, if you look at, as I mentioned, Exhibit 5, Shannon Wood's testimony, she was the last TDCJ witness. She explained, her entire point was to explain how they got to 180 days. And again, they were just picking one or two days around the edges for that. And then the exhibit they're talking about that was missing the month of September, that's Exhibit 3. But Ms. Harmon herself testified she took the entire month of September off as LWOP. I mean, that was part of her testimony. So the fact that that one month is missing from the records is not evidence that she, we know what happened in that month. And if you want to look at that exhibit and count the days, you add in, obviously, September, but you look at all the days that are marked 7777, that's the leave code, and then you count those, including the days in between when she wasn't supposed to work, and you're going to get 180 days by the time you get to June. So again, this, we're not talking about, they denied her a reasonable amount of leave. She was given 180 days or something very, very close to that. And the circuits are uniform that that amount of leave is permissible and that you don't have to give leave beyond that under the Rehabilitation Act or the ADA. And then just quickly on damages, testimony that I want, $1.8 million, is not testimony of how many damages or how much her damages were. She herself testified she made $3880 per month, that's at $2593 of the record, and that her back pay and wages that she had lost in the case. So again, we would ask that this Court reverse the judgment of the District Court. All right. Counsel, thanks to you both for your presentations. We'll take the next case in the morning.